## UNITED STATES v. JOTHAM BIXBY CO.
### No. 4070.

District Court, S. D. California, Central Division.

Jan. 11, 1932.

Samuel W. McNabb, U. S. Dist. Atty., and Sharpless Walker, Asst. U. S. Atty., both of Los Angeles, Cal.

Frank P. Doherty, of Los Angeles, Cal., for defendant and intervener.

HOLLZER, District Judge.

This is a condemnation proceeding instituted by the federal government to condemn a site for a post office and custom house in what was formerly the city of San Pedro, but is now part of the city of Los Angeles. The defendants include the city of Los Angeles, its board of park commissioners, and its board of library commissioners, and, in addition, a large number of individuals who are the heirs of the original owners of a tract of land known as the Palos Verdes rancho. The site which the government seeks to condemn comprises the north 400 feet of a tract of land which at one time constituted a part of said rancho, and which said tract of land, by a decree of court entered in certain partition proceedings under date of September 25, 1882, was set apart to the public as a plaza.

Approximately twenty-six years ago, and prior to the consolidation of the two cities, the authorities of the city of San Pedro constructed a city hall on the north end of the plaza tract. About a year later a public library was constructed on another portion of the plaza and this building at present is being used by the Chamber of Commerce and also for other purposes. In addition, the city of Los Angeles a few years ago replaced the former city hall of San Pedro with a modern seven-story municipal office building. The remaining portion of the plaza, including the site here sought to be condemned, has been developed into a park, and has been so used for many years. The city of Los Angeles and its park and library commissioners concede that the government is entitled to condemn the site mentioned. The only parties who are contesting this proceeding are the defendant C. M. Patten & Co. and the intervener, Grace M. Wilder, neither of whom claims any interest in the property. The latter asserts she is a taxpayer of said city of Los Angeles.

It is the contention of said defendant and said intervener that, inasmuch as the site here sought to be taken is a part of a tract of land already dedicated to a public use (in this in-

stance, a municipal park), the same may not be condemned by the federal government for a post office and custom house or any other public use inconsistent with that of a public park.

In support of this contention, counsel cites the case of Spires v. City of Los Angeles, 150 Cal. 64, 87 P. 1026, 11 Ann. Cas. 465; Kelly v. Town of Hayward, 192 Cal. 242, 219 P. 749; Humphreys v. City and County of San Francisco, 92 Cal. App. 69, 268 P. 388; Slavich v. Hamilton, 201 Cal. 299, 257 P. 60; Hall v. Fairchild-Wilton Co., 66 Cal. App. 615, 227 P. 649; Mulvey v. Wangenheim, 23 Cal. App. 268, 137 P. 1106; and Church v. City of Portland, 18 Or. 73, 22 P. 528, 6 L. R. A. 259.

These decisions, however, merely hold that a municipality may not use a public park for any purpose which would be inconsistent with the use of the property for park purposes. In none of these cases was the federal government a party.

In none of them was the court called upon to decide the issue involved here, namely, the right of the government of the United States to condemn for purposes of a post office and custom house land which was already in public use as a park.

As pointed out by the Supreme Court of the United States in Kohl et al. v. U. S., 91 U. S. 367, 371, 23 L. Ed. 449, the authority of the federal government to appropriate lands or other property within the states for its own uses and to enable it to perform its proper functions is essential to its independent existence and perpetuity: "The powers vested by the Constitution in the general government," said Mr. Justice Strong, speaking for the Court, in that case, "demand for their exercise the acquisition of lands in all the States. These are needed * * * for custom-houses, post-offices, and court-houses, and for other public uses. If the right to acquire property for such uses may be made a barren right by the unwillingness of property-holders to sell, *or by the action of a State* prohibiting a sale to the Federal government, the constitutional grants of power may be rendered nugatory, and the government is dependent for its practical existence *upon the will of a State,* or even upon that of a private citizen. This cannot be."

Again in the same opinion the learned justice observes (pages 373, 374 of 91 U. S.): "The proper view of the right of eminent domain seems to be, that it is a right belonging to a sovereignty to take private property for its own public uses, and not for those of another. Beyond that, there exists no necessity; which alone is the foundation of the right. If the United States have the power, it must be complete in itself. *It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment."* (Emphasis ours.)

This doctrine has been reiterated many times by our Court of last resort.

"It is now well settled," declares Mr. Justice Gray speaking for the Court in Chappell v. U. S. (160 U. S. 499, 509, 510, 16 S. Ct. 397, 400, 40 L. Ed. 510) "that whenever, in the execution of the powers granted to the United States by the constitution, lands in any state are needed by the United States for a * * * customhouse, courthouse, post office, or any other public purpose, and cannot be acquired by agreement with the owners, the congress of the United States, exercising the right of eminent domain, and making just compensation to the owners, may authorize such lands to be taken, either by proceedings in the courts of the state with its consent, or by proceedings in the courts of the United States with *or without any consent or concurrent act of the state, as congress may direct or permit"*—citing Kohl v. U. S., supra. (Emphasis ours.)

In accordance with the foregoing rule of law announced by our court of last resort, that tribunal, in U. S. v. Gettysburg Electric R. Co., 160 U. S. 668, 16 S. Ct. 427, 431, 40 L. Ed. 576, sustained the right of the federal government to condemn property already dedicated to a public use. In the last-mentioned case the land sought to be taken was a right of way which was being used by the defendant railroad company for the operation of its railroad pursuant to a charter granted to it by the state of Pennsylvania, and the federal government proposed to use this land for the purpose of adding the same to a memorial battle field and park. In upholding the paramount right of the national government to condemn this property, the court pointed out: "The power of congress to take land devoted to one public use for another and a different public use, upon making just compensation, cannot be disputed."

Following this same doctrine it was held in the case of U. S. v. City of Tiffin (C. C.) 190 F. 279, that the federal government had the power to condemn a public alley for a post office site. In that case, the city of Tiffin opposed the proceeding upon the

ground that the land sought to be condemned was already dedicated to a public use, and that neither an act of Congress nor an act of the state Legislature had expressly authorized the taking of this particular piece of property. In support of this contention, it also argued that land in public use cannot be taken for another and inconsistent public use under general legislative power of condemnation, but that the right must appear to seize the particular property by express provision directed toward the special property in some pertinent legislation, or by the inevitable implication arising from such special legislation.

In disposing of this contention, Judge Killits aptly pointed out (page 280, 281 of 190 F.):

"The attempt to apply the rule, however, in this case ignores the difference in status between the United States in its relation to lands sought to be devoted to public use and the parties attempting to condemn in the cases giving rise to the rule.

"The United States has paramount authority in the matter of taking any property within its borders for those public uses which are within the constitutional reservations to the general government. Its rights in this behalf are inherent in its sovereignty, and are prior to constitutions and statutes. The Constitution does not operate to create this right, but only to limit its exercise to certain objects. The several states for their own administrative purposes within their own borders hold authority of the same generally broad and extraconstitutional nature. The principle of strict construction of either the nature or extent of this right applies to neither sovereignty for the reason that such right is a very part of the sovereignty itself, existing from the beginning. This does not mean, however, that no power may intervene to prevent arbitrary action, for such power certainly abides with the courts.

"The rule offered in behalf of the city of Tiffin, on the other hand, is one which is the fruit of the application of the doctrine of strict construction of the power to invoke the principle of eminent domain granted by the Legislature to inferior public administrative corporations and to combinations of individuals who are engaging for their own profit in a public service. Because obligations for the public benefit are imposed upon municipal and public service corporations in the administration and conduct of their affairs, to them is delegated this attribute of sovereignty, which they can exercise only within the express provision of the legislative delegation strictly construed.

"An examination of the cases which support the rule in question shows that in each in which the right to condemn was denied the attempting condemnor was a municipal or a private public service corporation, which was vanquished by the application in this particular sense of the general principle that the legislative grant to it of a right to condemn must be strictly construed. No authority is shown, either in the briefs or in our own researches, in which the rule is applied against the sovereignty which it was established to protect. The Legislature, speaking the voice of paramount authority over all property, private as well as public, may, it is conceded, authorize the submission of property already in the public use to another public use, even when the conflicting public uses are those exercised by private public service corporations, if it specially determines upon such a course by particular legislation, and the rule invoked but operates to hold this right in the sovereign power until it clearly appears to have been given to some creature of the sovereignty, such as a municipal or public service corporation. The rule, having existence only to protect the sovereign power against its creatures, plainly, we think, may not consistently be offered to obstruct the supreme authority in the exercise of its administrative and sovereign functions. * * *

"Assuming the rule is applicable, then the government, after Congress has passed the necessary general legislation to establish a post office in this particular city, and the Secretary of the Treasury had exercised the semi-judicial function cast upon him by law to determine the necessity of any particular plot of ground and had selected this strip of alley, the maintenance of which is of very slight consequence to the city of Tiffin at large, would be compelled to await a session of Congress and reopen the whole matter for the purpose of getting an act passed specially designating this alley as one of the component parts of the site. It seems to us the statement of that proposition is all that is necessary to prove that the sovereign power ought not to be so hampered, and that the rule, having its birth in a jealousy for the rights of sovereignty, should not be extended to embarrass the object of its service."

We hold, therefore, that the limitation which prohibits a municipality from using for another and inconsistent purpose land al-

ready dedicated to a public use, as, for example, a public park, does not apply against the government of the United States.

 Likewise, we hold that no additional legislation on the part of Congress is necessary to enable the national government to condemn the specific parcel of property involved herein. Besides the general power granted by the Act of Congress of August 1, 1888, c. 728, 25 Stat. 357 (40 USCA §§ 257, 258), authorizing the Secretary of the Treasury to acquire by condemnation sites for post office and custom houses, Congress, by legislation approved March 5, 1928, chapter 126, 45 Stat. 162, 177, passed a statute entitled:

"An Act Making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1929, and for other purposes." This act, among other purposes, contained the following: "San Pedro, California, post office, customhouse, and so forth: For the acquisition of a site and toward the construction of building, including any tunnel that may be necessary, in addition to appropriation previously made, $100,000; and the Secretary of the Treasury is authorized to enter into contracts for the entire estimated cost of such building, site, and tunnel for not to exceed $575,000 in lieu of $60,000 fixed in the Act of March 4, 1913."

It is conceded that the Secretary of the Treasury of the United States has duly selected and designated as the site for the post office and custom house in San Pedro the particular parcel of land involved herein, and has authorized the Attorney General of the United States to institute the present proceeding.

In the light of the evidence introduced at the hearing, there can be no doubt that one of the unique and superior advantages of the property sought to be taken lies in the fact that the expeditious transfer of mail between the railroad tracks at San Pedro and the building to be erected on the proposed site can readily be accomplished through the construction of a tunnel connecting said tracks and such building.

On the other hand, no other available site, so far as the evidence discloses, would render practicable the tunnel plan for facilitating the handling of mail. Therefore it becomes apparent that by the statute last mentioned Congress had direct reference to the land here sought to be condemned.

Finally, it should be noted, as abundantly established by the evidence, that the land sought to be taken possesses a combination of advantages both as regards the governmental departments and the general public which no other offered or available site affords. The property in question, by virtue of its close proximity to the Harbor Channel, would render more prompt and efficient all federal activities with the extensive shipping interests at the harbor, including the functions of such departments as the Customs, Immigration, Public Health, Quarantine, etc. The proposed site affords an unobstructed view of the Harbor Channel and the harbor, and the arrival and departure of steamships and the location of vessels at anchor. The establishment of appropriate governmental departments at this site would permit the prompt transaction of all governmental business with ships and their cargoes, and in a manner likely to cause the least delay and expense to those affected. As already pointed out, the proximity of the railroad tracks and the topographical character of the proposed site make feasible the construction of the tunnel connecting said tracks with the proposed post office, thereby expediting and facilitating the transfer of mail. In addition, the proposed site is surrounded on three sides by public thoroughfares and on the remaining side by a public park, thereby offering unusual facilities for fire protection and parking space.

We conclude, therefore, that the purpose to which the land in question is to be applied is a more necessary public use than the present use thereof, that Congress has authorized the taking of said property, and has provided for compensation to be paid for the same, and that the national government is entitled to condemn said land in this proceeding.

Counsel for the government will prepare and serve findings and decree in conformity with this opinion, said decree to provide for a reference to a special master to hear and report upon further proceedings to be had herein.

An exception is allowed to the defendant C. M. Patten & Co., and the intervener, Grace M. Wilder.